CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

JUL 0 2 2009

JOHN F. CORCORAN, CLERK
BY: /s/
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| ROBERT G. MISKA, ) | |
|     Plaintiff, ) | Civil Action No. 7:09-cv-00172 |
| ) | |
| v. ) | **MEMORANDUM OPINION** |
| ) | |
| MIDDLE RIVER REGIONAL JAIL, ) | |
| et. al., ) | By: Hon. Glen E. Conrad |
|     Defendants. ) | United States District Judge |

Plaintiff Robert G. Miska, proceeding pro se, brings this action under the Civil Rights Act, 42 U.S.C. § 1983, with jurisdiction vested under 28 U.S.C. § 1343. During the final weeks of his incarceration at Pocahontas State Correctional Center, Miska filed this complaint against the Middle River Regional Jail ("the jail"), asserting that several aspects of the living conditions to which he was subjected at the jail violated his constitutional rights. He has since been released, but seeks to pursue this lawsuit, in forma pauperis and to amend his complaint.[1] Upon review of his financial affidavit, the court will grant him in forma pauperis status and will grant his motion to amend. However, the court also concludes that the action must be dismissed without prejudice, pursuant to 28 U.S.C.

---

[1] The court filed Miska's complaint conditionally, pending plaintiff's compliance with the filing requirements for in forma pauperis prisoner civil actions, pursuant to 28 U.S.C. § 1915(b) and 42 U.S.C. § 1997e(a). Immediately thereafter, Miska notified the court that he had been released from prison and provided his new address. He also asked about the status of his complaint. The court issued an amended conditional filing order, directing Miska to provide information about his financial status since his release and advising him that his allegations did not state actionable claims unless he amended to correct noted deficiencies. He has now provided an affidavit in support of his application to proceed in forma pauperis and an amendment to his complaint.

1

§ 1915(e)(2), because the allegations as amended fail to state any constitutional claim cognizable under § 1983.[2]

**Background**

The court construes Miska's allegations as raising the following claims for relief under § 1983 against officials at the jail:[3]

1. On January 13, 2007, Capt. Dull refused to allow Miska to use the microwave for heating his mealtime items, although nonindigent inmates were allowed to use the microwave to heat food items they purchased from the commissary except during mealtimes.

2. On October 3, 2007, Jack Lee, Capt. Dull, and Lt. Shifflett locked down the entire dorm for two weeks because two or three men had been disruptive; during lockdown, Miska's shower times were dictated, he had to use the bathroom in front of his cell mate, the flies were "irritating," and basic privileges were suspended (TV, games, interaction with others, telephone usage).

3. From mid-December 2007 until March 7, 2008, C. O. Coalson and Sgt. Surface intercepted Miska's incoming personal mail, marking it, "Return to sender, no longer incarcerated at [this jail]"; Miska was informed of this problem through an April 22, 2008 letter from his sister, after he was transferred to another prison on March 7, 2008.

4. (a) When Miska arrived at the jail on June 26, 2006, the blister-pak containing his wallet and personal items was broken open and $20 disappeared; he filed no grievances about this problem;

---

[2] Under § 1915(e)(2)(B), the court may dismiss an action filed in forma pauperis at any time for failure to state a claim upon which relief may be granted.

[3] Miska asserts generally that the conditions he challenges violated his rights under the First, Fourth, Eighth, and Fourteenth Amendments to the Constitution.

2

(b) Also upon his arrival at the jail in June 2006, he tried to transfer $20 into his trust account, but it never came through; having no money on his account, he was unable to contact his family by mail, and his car was sold at auction as a result.

5. After Miska and other inmates filed grievances about having to eat near one's toilet without being provided adequate cleaning supplies, on November 15, 2007, jail officials moved Miska to segregated confinement "for health reasons" against his will.

(a) During the move to segregation, Miska lost $53 worth of personal property and personal photographs;

(b) In segregation, Miska's privileges were limited; he had no contact visits, no TV, no games, no canteen; he could possess only writing utensils and books; a camera watched his every move, including toilet usage; the sewer backed up on November 25, 2007, and sewer water stood up to one inch deep on the floor of his cell for most of the day;

(c) On November 27, 2007, Miska was moved to a maximum security dorm in which he was locked down 23 of 24 hours every day with no privileges; two days later, he was moved again to another maximum security dorm with privileges, but with 23-hour-lockdown every day; the sewer in this dorm backed up on December 15, 2007; he was moved to a medium security dorm with privileges in January 2008;

(d) Officer Vernon Reynolds used force maliciously and sadistically when he cuffed and shackled Miska and escorted him to segregation while making "jovial" comments to another officer.

6. Officers at the jail showed indifference toward inmates by refusing to provide request forms and grievance forms in a timely manner and delaying responses to all requests for services, such as photocopies; they reminded the inmates/detainees that they were prisoners and would be

3

treated as such and made inappropriate jokes about body parts.

7. Officers displayed "no sense of decency" when they refused to provide cleaning gloves when requested; inmates were told to request the gloves when they received supplies for cleaning; cleaning supplies were rarely brought, inmates occasionally used the shower as a toilet, mold grew 24 inches up the shower walls, and flies in the dorm made sleeping difficult;

8. Several jail policies were not rationally related to legitimate penological interests:

(a) Officials denied a request in December 2007 from Miska's priest for a private room in which the priest could administer the Sacraments of Confession and Communion; officials told him to take Confession over the telephone, but the priest told Miska that he does not do that;[4] on another occasion, Miska was denied a visit with his brother, who had always been on his visitation list;

(b) In mid-January 2008, officials required Miska to undergo a visual strip search in a small room near the visitation area, despite the fact that he was escorted to and from the visits which were noncontact;

(c) On October 1, 2006, Miska submitted a request to be allowed to vote in the November 2006 elections; he did not receive a ballot application until October 27, 2006 and filed it immediately, but when he received his absentee ballot, it had been opened in the mail room; he mailed the completed ballot on November 3, 2006, but as of November 8, 2006, voting officials had not received it;

(d) On June 4, 2007, Miska asked to be allowed to vote in a June 12, 2007 primary and was given an absentee ballot application. Because of his November 2006, experience, he filed a request

---

[4] Miska states that his Catholic faith is very important to him, he attends mass every Sunday, and goes to Confession at least once a year and when he feels troubled.

4

on June 6, 2007 to be taken to his polling place, after his trial was continued, but his request was denied for security reasons;

9. Miska repeatedly expressed his concerns about what he perceived to be a lack of attention to sanitation issues at the jail, and officers gave only "lip service" in response at first; he felt threatened by one verbal exchange and one officer's slamming a door behind him, and believes that he was transferred to segregation thereafter in retaliation for his complaints.

Miska has sued the jail and several jail officials by name. As relief for the alleged constitutional violations, he seeks monetary damages.

## Discussion

To state a cause of action under §1983, a plaintiff must establish that he has been deprived of rights guaranteed by the Constitution or laws of the United States and that this deprivation resulted from conduct committed by a person acting under color of state law. West v. Atkins, 487 U.S. 42 (1988). Under 28 U.S.C. § 1915(e), which governs in forma pauperis proceedings, the court has a mandatory duty to screen initial filings and "must dismiss an action that the court finds to be frivolous or malicious or that fails to state a claim." Michau v. Charleston County, 434 F.3d 725, 728 (4th Cir. 2006). In addressing a motion to dismiss, pursuant to Fed. R. Civ. P. 12(b)(6), the court must "accept as true all well-pleaded allegations" and construe those allegations in the light most favorable to the plaintiff. Mylan Labs, Inc. v. Matkari, 7 F.3d 1130, 1134 (4th Cir. 1993). The factual allegations in the complaint must contain "more than labels and conclusions" and "must be enough to raise a right to relief above a speculative level." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). After review of Miska's allegations as amended, the court concludes that he fails to allege facts stating any plausible claim actionable under § 1983.

The inquiry of federal courts into prison management is limited under §1983 to whether a particular practice or regulation violates any constitutional provision. Outside this inquiry, courts must leave judgment calls to the expertise of prison officials. See Bell v. Wolfish, 441 U.S. 520, 547 (1979); Block v. Rutherford, 468 U.S. 576 (1984) (courts cannot substitute their own judgment on institutional management for that of prison officials). In all cases in which a prisoner asserts that a prison policy violates the Constitution, therefore, the principle that inmates retain at least some constitutional rights must be weighed against the recognition that prison authorities are best equipped to make difficult decisions regarding prison administration. Washington v. Harper, 494 U.S. 210, 223-24 (1990). Accordingly, there need be only a rational connection between a prison policy and a legitimate governmental interest put forward to justify it. Turner v. Safley, 482 U.S. 78, 89-91 (1987). Particularly where other avenues remain available for exercise of a constitutional right, prison officials should be afforded broad discretion. Id.. The burden of proof under the Turner analysis is on the prisoner to disprove the validity of the prison regulation at issue. Overton v. Bazzetta, 539 U.S. 126, 132 (2003).

It appears from Miska's allegations that at least part of the time he was incarcerated at the jail, he was a pretrial detainee, not yet convicted of criminal wrongdoing. Claims concerning confinement conditions imposed upon pretrial detainees are to be evaluated under the Due Process Clause, rather than under the Eighth Amendment. Bell, 441 U.S. at 535-538. Due process proscribes punishment of a detainee before proper adjudication of guilt has been accomplished. Id. Conditions of confinement generally cannot be considered punishment so long as they are rationally connected to a legitimate, nonpunitive penological purpose and are not excessive in relation to that purpose. Id. Moreover, as a practical matter, the contours of the Due Process Clause in the prison

6

context tend to be coextensive with the substantive constitutional principles applied via the Eighth Amendment to convicted inmates. Riley v. Dorton, 115 F.3d 1159, 1166-67 (4th Cir. 1997) (excessive force); Hill v. Nicodemus, 979 F.2d 987, 991-92 (4th Cir. 1992) (medical needs). The fact that the detainee remained at the facility for a limited length of time may be considered in determining constitutionality of conditions or restrictions. Bell, 441 U.S. at 542.

**A. Jail Living Conditions**

In order to state a claim of constitutional significance regarding prison conditions, a plaintiff must allege facts demonstrating that the challenged conditions resulted in a deprivation of a basic human need that was objectively "sufficiently serious" and (2) that, subjectively, the defendant prison officials acted with a sufficiently "culpable state of mind" with regard to the conditions. Wilson v. Seiter, 501 U.S. 294, 298 (1991). To satisfy the objective element of a conditions claim, the plaintiff must show that he has sustained a serious or significant mental or physical injury as a result of the challenged conditions. See Strickler v. Waters, 989 F.2d 1375, 1380-1381 (4th Cir. 1993).

Miska complains about several conditions to which he was subjected while he was incarcerated at the jail: not being allowed to heat meals in the microwave;[5] being locked down for two weeks with limited shower time, suspension of privileges, irritating flies, and less than desirable

---

[5] Miska complains that nonindigent inmates were allowed to use the microwave other than at mealtimes, apparently arguing that the rule prohibiting microwave use during meals somehow discriminated against him. To the extent that he intends to make a claim that this rule violated equal protection principles, it fails. The rule treats all inmates alike during mealtimes, and disallowing inmates to use the microwave to heat their regular meals is rationally related to the jail's interests in preventing disagreements and confusion bound to be caused by many inmates seeking to use the microwave at the same time. See Moss v. Clark, 886 F.2d 686, 690 (4th Cir. 1989) ("The only proper judicial inquiry [regarding equal protection claims in the prison context] is whether the [classification] serves a legitimate state [penological interest and whether the challenged classification is rationally related to it." ).

sanitation; having to eat near one's toilet despite being provided inadequate cleaning materials; being in a maximum security dorm for two weeks with no privileges except writing utensils and books; having backed up sewer water on the floor of his cell for several hours on two different occasions; being locked down 23 of 24 hours per day for approximately one month; and not being provided gloves for cleaning. While these conditions were no doubt uncomfortable and frustrating, Miska does not allege facts indicating that he suffered any serious or significant injury as a result of any of these circumstances. He also fails to allege facts indicating that conditions were imposed on him with any intent to punish him before his conviction. As his allegations as amended thus fail to state any claim that he was subjected to jail conditions so adverse as to be unconstitutional, the court will dismiss this aspect of his complaint accordingly, pursuant to § 1915(e)(2)(B).

### B. No Privacy Violations

"Persons in prison must surrender many rights of privacy which most people may claim in their private homes. Much of the life in prison is communal, and many prisoners must be housed in cells with openings through which they may be seen by guards." See Lee v. Downs, 641 F.2d 1117, 1119 (4th Cir. 1981). So long as the loss of privacy, however, is rationally related to legitimate penological interests, it does not violate constitutional protections. Id.; see also Turner, 482 U.S. at 89-91. A visual strip search of a detainee's nude body parts, when reasonably related to security interests and conducted in a reasonable manner, also withstands constitutional muster. Bell, 441 U.S. at 558-60.

The court does not find that any of the privacy concerns raised in Miska's complaint rise to constitutional proportion. Certainly, a lock down situation imposed by jail officials after an admitted disruption by some inmates furthers reasonable security interests in ensuring that no

8

additional disruptions take place. The fact that locked down cell mates may not give each other privacy to use the toilet is reasonably related to the legitimate security interests furthered by the lock down itself. Similarly, jail officials have legitimate security interests in keeping cell windows in the segregation unit uncovered and/or using security cameras in a segregation area of the jail in order to catch disruptive or injurious behavior before it gets out of hand. The minor loss of privacy accompanying these necessary security measures is reasonably related to the prison's legitimate goals. The visual strip searches that Miska describes, conducted in a private room whenever he was transported to or from his maximum security cell in connection with noncontact visits, were not overly invasive and reasonably furthered a legitimate interest in preventing inmates in the secure area from transporting any contraband item (such as any item that might be manufactured into a weapon or used as currency) to or from other less secure areas of the jail. Moreover, Miska's exposure to each of the privacy limitations of which he complains was limited to a few weeks at the most. For these reasons, the court finds that Miska's allegations fail to state any constitutional claim regarding unreasonable deprivation of privacy and will dismiss all such claims, pursuant to § 1915(e)(2)(B).

### C. Interference with Outgoing Mail

A short delay in an inmate's receipt of mail simply does not state a claim of constitutional dimension. Pearson v. Simms, 345 F. Supp.2d 515, 519 (D. Md.2003) ("occasional incidents of delay or non-delivery of mail" are not actionable). Moreover, negligent actions that infringe on an inmate's First Amendment rights do not state any constitutionally significant claim. Pink v. Lester, 52 F.3d 73, 75-76 (4th Cir. 1995), citing Daniels v. Williams, 474 U.S. 327 (1986).

Miska's allegations concerning mail wrongfully being returned to sender for a period of

several weeks states nothing more than a claim of negligence on the part of mail room personnel at the jail. Miska admits that he himself did not learn of the problem until after he was transferred; as such, he did not notify the jail staff of the problem in time for it to be corrected. As negligent acts by prison officials are not sufficient to give rise to any constitutional claim, the court will dismiss Miska's mail claim, pursuant to § 1915(e)(2)(B). Daniels v. Williams, supra.

### D. Lost Property

Allegations that prison officials randomly deprived an inmate of his property, whether intentionally or as a result of negligence, do not state any constitutional claim "if a meaningful post-deprivation remedy for the loss is available." Hudson v. Palmer, 468 U.S. 517, 533 (1984). Inasmuch as Miska possessed tort remedies under Virginia state law, see Virginia Code § 8.01-195.3, it is clear that he cannot prevail in a constitutional claim for the alleged property losses in this case. The court will dismiss his claims regarding his lost currency, pursuant to § 1915(e)(2)(B).

### E. Retaliation

Claims of retaliation by inmates are generally treated with skepticism because "[e]very act of discipline by prison officials is by definition 'retaliatory' in the sense that it responds to prisoner misconduct." Cochran v. Morris, 73 F.3d 1310, 1317 (4th Cir. 1996); Adams v. Rice, 40 F.3d 72, 74 (4th Cir. 1994). To succeed on a retaliation claim under § 1983, an inmate must allege facts sufficient to demonstrate that the alleged retaliatory act "was taken in response to the exercise of a constitutionally protected right or that the act itself violated such a right." Adams, 40 F.3d at 75. Thereafter, plaintiff must demonstrate that he suffered some adverse impact or actual injury. ACLU of Md., Inc. v. Wicomico County, Md., 999 F.2d 780, 785 (4th Cir. 1993).

10

Additionally, an inmate must come forward with specific evidence "establish[ing] that but for the retaliatory motive, the complained of incident . . . would not have occurred." Woods v. Smith, 60 F.3d 1161, 1166 (5th Cir. 1995). On the other hand, an inmate must present more than conclusory allegations of retaliation. Adams v. Rice, 40 F.3d 72, 74 (4th Cir. 1994).

Miska alleges that after he led other inmates in complaining, verbally and in writing, about the lack of cleaning supplies, he was transferred to a higher security area of the prison where he had fewer privileges; he also states, however, that the transfer was for "health reasons." Miska bases his assertion that the transfer was retaliatory on officers' delayed response, and flippant attitudes and comments about his complaints regarding cleaning supplies.

The court does not find these allegations sufficient to state any actionable claim of retaliation. First, because inmates have no constitutional right to a grievance procedure regarding jail conditions, Adams, 40 F.3d at 75, Miska was not exercising any constitutionally protected right when filing grievances about cleaning supplies. Second, he does not allege specific facts indicating that officials decided to transfer him because he complained. As stated, he admits that the officers referred to "health reasons" as explanation for the transfer. His assertions that the transfer was retaliatory are conclusory, unsupported by anything more than his suspicions about the officers' motives. Finding insufficient factual allegations to state a § 1983 claim of retaliation, the court will dismiss this aspect of Miska's complaint, pursuant to § 1915(e)(2)(B).

**F. Due Process Regarding the Transfer to Segregation**

Convicted inmates' liberty "interests will be generally limited to the freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical and

11

significant hardship on the inmate in relation to the ordinary incidents of prison life." Sandin v. Conner, 515 U.S. 472, 484 (1995). In Sandin, the Court found that disciplinary segregation did not constitute atypical and significant hardship so as to warrant federal due process protections where: (1) the disciplinary segregation mirrored conditions of other forms of completely discretionary confinement; (2) based on a comparison between inmates inside and outside of disciplinary segregation, the state's action in placing the defendant in segregation did not significantly disrupt the defendant's environment; and (3) the state action did not affect the duration of the defendant's sentence. Id.

The United States Court of Appeals for the Fourth Circuit has held that confining segregation inmates for more than six months in conditions much worse than those Miska alleges was insufficient to trigger any federal right to due process before an inmate may be subjected to such conditions. Beverati v. Smith, 120 F.3d 500, 504 (4th Cir. 1997).[6] Moreover, Miska's segregated confinement lasted just over one month, as compared to six months in the Beverati case. Balancing these factors, the court cannot find that the segregation conditions of which he complains were atypical enough to impose "a significant hardship in relation to the ordinary incidents of prison life" so as to trigger federal due process protections. Id. To the extent that Miska alleges a due process violation in connection with his segregated confinement, the court will dismiss his complaint, pursuant to § 1915(e)(2)(B).

---

[6] The Beverati segregation inmates complained of no outside recreation, no clean clothes, less food, and cells infested with vermin and smeared with urine and feces. Id.

12

## G. Excessive Force

Miska asserts that an officer used force "maliciously and sadistically" when restraining Miska and escorting him to the segregation unit. The key inquiry regarding an excessive force claim in the prison context is "whether the force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Hudson v. McMillian, 503 U.S. 1, 7 (1992). De minimis injury can be conclusive evidence that the force used was also de minimis and, therefore, not violative of constitutional protections. See Norman v. Taylor, 25 F.3d 1259 (4th Cir. 1994). Even after being advised to amend his complaint regarding injuries caused by the alleged constitutional violations, Miska fails to allege suffering any injury whatsoever as a result of being cuffed and shackled while he was escorted to segregation. Thus, he fails to demonstrate that the force used was applied for any purpose other than orderly administration of the transfer, and the court will dismiss his excessive force claim accordingly, pursuant to § 1915(e)(2)(B).

## H. Officials' Comments and Attitudes

Mere threats or verbal abuse by prison officials, without more, do not state a cognizable claim under § 1983. Henslee v. Lewis, 153 Fed. App'x 178, *1 (4th Cir. 2005) (unpublished) (citing Collins v. Cundy, 603 F.2d 825, 827 (10th Cir. 1979); Emmons v. McLaughlin, 874 F.2d 351, 354 (6th Cir. 1989) (verbal threats causing fear for plaintiff's life not an infringement of a constitutional right).

At the most, Miska's allegations suggest that jail officers at times harassed him verbally, made idle threats about his continued grievances, and responded lightly to requests and concerns that he considered serious. Neither the verbal exchanges that irritated Miska nor his perception

13

of the officers actions and comments as vulgar or uncaring is sufficient to state any independent constitutional claim. Moreover, Miska's complaint that officials did not respond promptly to his requests for services and his grievances also does not rise to constitutional proportion, as inmates have no constitutional right to any grievance procedure. Adams, 40 F.3d at 75. Pursuant to § 1915(e)(2)(B), the court must dismiss all aspects of Miska's complaint to the extent that he attempts to impose liability on jail officials based on their words and attitudes, as these allegations fail to state any claim cognizable under § 1983.

### I. Denial of Religious Rights

The Supreme Court has held that a neutral, generally applicable law does not offend the Free Exercise Clause, even if the law has an incidental effect on religious practice. Employment Division v. Smith, 494 U.S. 872, 876-79 (1990). See also Hines v. South Carolina Department of Corrections, 148 F.3d 353, 357 (4th Cir. 1998); American Life League, Inc. v. Reno, 47 F.3d 642, 654 (4th Cir. 1995). Prior to deciding Smith, the Supreme Court held that in deference to the expertise of prison administrators in managing the difficult challenges of incarceration, even a prison policy that substantially burdens an inmate's ability to practice his religious beliefs withstands a First Amendment challenge so long as it is rationally related to a legitimate governmental interest. O'Lone v. Estate of Shabazz, 482 U.S. 342, 349 (1987); Turner, 482 U.S. at 89-91.[7] A "substantial burden" is one that "puts substantial pressure on an adherent to

---

[7] Under Turner, the court must consider four factors in addressing an inmate's constitutional claim: (a) whether there is a "valid, rational connection" between the regulation and a legitimate and neutral governmental interest; (b) whether "alternative means of exercising" the asserted constitutional right remain available to the inmate; (c) whether accommodation of the asserted right will have an impact on prison staff, on inmates' liberty, and on the allocation of limited prison resources; and (d) whether the regulation is "an exaggerated response" to the prison concerns it addresses. Id. at 89-91 (internal quotations omitted).

14

modify his behavior and to violate his beliefs." Thomas v. Review Bd. of Indiana Employment Sec. Div., 450 U.S. 707, 718 (1981).

Miska alleges that during the four to five weeks in November and December 2007, while he was in segregated confinement, he was unable to have contact visits with his priest, which prevented him from giving Confession or taking Communion during the holidays. He admits that he generally goes to Confession once per year, unless he feels particularly "troubled." The court notified Miska that he should amend his complaint to explain why these rites were important to the practice of his religious beliefs, what requests he made to jail officials regarding his desire to receive Communion and Confession, and what responses he received. In his amendment, Miska mentions only one instance when his priest asked for a private room in which to administer the Sacraments to Miska. The inmate does not allege that he himself made any specific requests about his need to practice this aspect of his religious beliefs.

If Miska failed to exhaust his administrative remedies regarding the importance of these sacraments to his religious practice, his religious exercise claim could be subject to dismissal under 42 U.S.C. § 1997e(a). He may not hold officers individually liable for failing to accommodate a religious belief if he neglected to take the trouble to file requests explaining why the contact visit with the priest was important to his exercise of his faith.

In any event, the court also finds that plaintiff has failed to allege facts supporting the claim that being unable to receive the Sacraments, person to person, on one occasion violated his constitutional right to free exercise of his beliefs. First, his allegations do not indicate that the policy of allowing only noncontact visits is anything other than a neutral and generally applicable policy for all inmates in the segregation unit; as such, under Smith, 494 U.S. at 876-79, the

15

policy's incidental effect on Miska's religious beliefs is not a constitutional violation actionable under § 1983. Second, the noncontact visit policy withstands analysis under Turner. 482 U.S. at 89-91. The policy furthers legitimate jail interests in maintaining extra security when segregation inmates interact with the public; Miska retains alternative means of exercising his Catholic beliefs; providing a private room and security for the priest during a contact visit would require an additional outlay of prison resources; and Miska fails to prove that the uniform nature of the policy is an exaggerated response to the security concerns posed by segregation inmates as a group. Id. Third, even after being directed to amend, Miska simply failed to demonstrate that missing Communion and Confession on one occasion placed a substantial burden on his ability to practice his faith. Thomas, 450 U.S. at 718. The court will dismiss Miska's religion claim accordingly, pursuant to § 1915(e)(2)(B).

### J. Voting Rights

"Unless a detainee is able to demonstrate that he is completely barred from voting, an equal protection challenge to diminished access to voting must fail if the defendant's provisions for voting by detainees are rationally related to a legitimate state end." Wingate v. Horn, No. 07-2521, 2009 WL 320182 (2d Cir. 2009) (unpublished) (citing McDonald v. Bd. of Election Comm'rs, 394 U.S. 802, 808-09 (1969). Miska admits that he had access to applications for absentee ballots and that jail officials cited expense and security problems in declining to transport him to his polling place. As he cannot demonstrate that the jail's policy completely barred him from voting or that the policies regarding voting were not rationally related to legitimate prison interests, Miska has no equal protection claim. Moreover, he admits that he had time and opportunity to cast an absentee ballot and only failed to do so on two occasions, either

16

because of alleged negligence by the jail's mail room staff or because of his own decision to forego the absentee ballot system in hopes of being taken to the polls.

## Conclusion

For the stated reasons, the court concludes that Miska's allegations do not state any constitutional claim cognizable under § 1983. Accordingly, the court will dismiss the complaint without prejudice, pursuant to § 1915(e)(2)(B). An appropriate order shall be entered this day.

The Clerk is directed to send copies of this memorandum opinion and accompanying order to plaintiff.

ENTER: This 2d day of July, 2009.

*/s/ Glen Conrad*
United States District Judge